(C. D. 895)

Rubin Bros. Footwear *v*. United States

United States Customs Court, First Division

(Decided November 15, 1944)

Tompkins & Tompkins (*J. Stuart Tompkins* of counsel) for the plaintiff.
Paul P. Rao, Assistant Attorney General (*Robert C. O'Grady*, special attorney), for the defendant.

Before Oliver, Walker, and Cole, Judges

Walker, Judge: The merchandise the subject of this suit consists of cowhide leather imported from Uruguay and assessed with duty at the rate of 20 per centum ad valorem under the provision in paragraph 1530 (d) of the Tariff Act of 1930, as modified by the British Trade Agreement, T. D. 49753, for—

Leather made from hides or skins of cattle of the bovine species, grained * * *.

Various claims for lower rates are made in the protest, all, however, being dependent upon a finding that the leather in issue is not "grained" within the meaning of that term as used in the provision under which duty was assessed, since the provision under which the claims are made, paragraph 1530 (b), specifically excludes leather provided for in subparagraph (d), *supra*.

The evidence before us consists of two samples of the leather involved, marked exhibits 1 and 2, respectively, four collective illustrative exhibits offered by the plaintiff with the purpose of showing what leathers are included within the term "grained," and the oral testimony of three witnesses, one on behalf of the plaintiff and two on behalf of the defendant.

On the main point, i. e., whether the leather in issue is "grained" leather, the testimony of the plaintiff's witness and the defendant's witnesses is conflicting. In view of the fact that a decision in the matter compels us to accept one view and reject the other, a review of the oral evidence is, we think, in order.

The business of the plaintiff firm is shoe manufacturing. One of the members of the firm, Isidore Rubin, was its witness, and testified that for the past 25 years, in the course of his engagement in the shoe manufacturing business, he had purchased leather of every description, including grained leather. He identified exhibits 1 and 2 as fairly representing the merchandise, and stated that he had personally purchased it in Uruguay, not as grained leather, but as upper leather for shoes. It was, he said, a natural grain leather, and it is clear from the witness's testimony both on direct and cross-examination that he considered a "grained" leather to be one which had been embossed or printed by a hot plate or machine to show a pattern resembling a grain.

On cross-examination the witness was questioned as to a process known as "boarding," which he described as a rolling process, the purpose of which was to "mellow" the leather. He denied that boarding was used to bring out, or accentuate, the natural grain of the leather, and he further testified that the leather in issue had not been subjected to the boarding process.

Although he originally stated that exhibits 1 and 2 fairly represent the merchandise, he later said that the majority of the leather as received was smooth. From our examination of the said exhibits it appears that only a small portion thereof is smooth, the remainder showing a well-defined grain pattern.

Morris Lenobel, a leather salesman of some 18 or 19 years' experience, was the first witness called by the defendant. He said that in addition to his selling experience he had worked in leather tanneries and had performed regular tannery work, including finishing and graining. Boarding, he said, may be done for various reasons, depending upon what the leather is ultimately intended for, but in each case, he said, it accentuates the natural grain of the leather.

Upon examining exhibits 1 and 2 the witness identified them as hand boarded leather and as hand grained leather, and it is clear from his testimony that he recognized boarding, as well as embossing with a hot plate, as processes of graining leather.

Simon Tannenbaum, a leather salesman of 24 years' experience, who was the second witness called by the Government, agreed with witness Lenobel that exhibits 1 and 2 were boarded leather, but he stated that he, personally, did not use the term "grained" in relation to them. A boarded leather, he said, he called "elk finish" leather, but if one called boarded leather "grained leather" he would say that exhibits 1 and 2 were grained leather.

Four illustrative exhibits, consisting of pieces of leather, were introduced, each of which had been embossed with a grain pattern by means of a hot plate. These were marked illustrative exhibits A, B, C, and D, and it might be said at this point that apparently all of the

witnesses were in agreement that they fell within the term "grained leather." Witness Rubin, however, maintained that they were the only leather so called, while witness Lenobel maintained that natural grain leathers on which the grain had been brought out or accentuated were also known as grained leathers. Witness Tannenbaum apparently had no personal conviction one way or the other.

The subject of "grained leather" was treated rather exhaustively in the opinion of the Court of Customs and Patent Appeals in the case of *United States* v. *John B. Stetson Co.*, 21 C. C. P. A. 3, T. D. 46319, and the court held that leather which had been boarded for the purpose of bringing out or accentuating the natural grain was included within the term "grained leather" as used in paragraph 1530, *supra*. The court stated its conclusion as follows:

A consideration of these authorities, in view of the evidence, leads the mind to the conclusion that the imported leathers have been "grained" within the common meaning of that word. The operation of "boarding" was to produce a surface finish upon the leather which would otherwise not have been there.

We regard the *Stetson* case as controlling on the issue of whether boarding leather with the result of producing an accentuated grain pattern produces "grained" leather, and we are of the opinion that a preponderance in weight of the evidence establishes that the leather in issue, prior to importation, was subjected to a process of boarding which accomplished that result. It follows that we must hold it to be grained leather within the meaning of that term as used in the tariff act.

Counsel for the plaintiff has cited in the brief filed in its behalf the case of *United States* v. *Pacific Binding Library Co.*, 22 C. C. P. A. 641, T. D. 47617. That case involved certain colored morocco leather classified as "fancy" leather under the provisions of paragraph 1530 (d) of the Tariff Act of 1930. During the course of the opinion the court said:

We think it is shown by the record that the grain on the imported leather is the natural grain, and that it has not been "grained  *  *  *  in any manner or to any extent" as is provided in the paragraph.

There does not seem to have been any evidence adduced in that case to indicate that the leather in question had been boarded for the purpose of accentuating the natural grain of the skin, and we are therefore unable to consider it as having any relevancy to the issue in the present case.

As our holding that the leather in issue falls within the term "grained" leather supports the collector's classification, the protest claims must be overruled. Judgment will issue accordingly.